# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

OCR SOLUTIONS, INC.,

    Plaintiff,

v.                                            Case No: 6:17-cv-709-Orl-28DCI

CHARACTELL, INC. and
CHARACTELL, LTD.,

    Defendants.
_____

# ORDER

Plaintiff OCR Solutions, Inc. (OCR) and Defendants CharacTell, Inc. and CharacTell, Ltd. (collectively, CharacTell) filed claims and counterclaims against one another regarding OCR's use of identification card-reading software called "idCliQ." CharacTell claims that it solely owns idCliQ and that OCR was merely a reseller of its product. CharacTell is currently preventing OCR from reselling idCliQ despite OCR's claims that it co-owns the product under an oral joint venture agreement. OCR now seeks a preliminary injunction to provide it access to the idCliQ software, which would enable it to provide support to its existing clients and to obtain new clients during the course of the litigation. (Mot. Prelim. Inj., Docs. 45 & 48, at 25).[1] OCR also seeks to prevent CharacTell from luring away OCR's clients under a signed Mutual Confidentiality Agreement. (Id.). After considering the motion, CharacTell's response in opposition, (Doc. 51), the parties' argument at a June 9, 2017 hearing, (Mins., Doc. 59), and the parties' evidence, (Docs. 47, 49, 49-1, 49-2, 51-1, 51-2, 51-3), the motion must be denied.

---

[1] OCR filed the motion twice.

To obtain a preliminary injunction the movant must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." Schiavo ex rel. Schindler v. Schiavo, 403 F.3d 1223, 1225–26 (11th Cir. 2005). "'[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishe[s] the "burden of persuasion"' as to each of the four prerequisites." Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998)).

A.  **Likelihood of Success on the Merits**

OCR's motion for a preliminary injunction is premised on the likelihood that it will ultimately establish that (1) there was a valid oral agreement between the parties establishing a joint venture in the creation, marketing, and sale of idCliQ, and (2) the Mutual Confidentiality Agreement signed by the parties is enforceable.

1.  *Joint Venture Agreement*

"A joint venture is a special relationship of two or more parties to engage in and carry out a single business venture for joint profit." Winey v. William E. Dailey, Inc., 636 A.2d 744, 751 (Vt. 1993) (internal citation and quotation marks omitted). Under both Massachusetts law and Vermont law,[2] a joint venture agreement can be made orally.

---

[2] The parties disagree as to which state's law applies to this case—Florida, Massachusetts, or Vermont. Eyal Barsky, the president and owner of OCR, resided in Vermont when discussions about idCliQ began, and he moved to Florida in February 2015. (First Barsky Decl., Doc. 19, ¶¶ 1, 4–5, 22). Paz Kahana, president and director of CharacTell, Inc. and president and CEO of CharacTell, Ltd. resided in Massachusetts throughout the development of idCliQ. (Kahana Aff., Doc. 12-4, ¶¶ 1, 7; First Barsky Decl. ¶ 24). When determining the validity of a contract—as the Court must do here—"Florida adheres to the rule of *lex loci contractus*—applying the law of the state or country where

2

Mass. Prop. Ins. Underwriting Ass'n v. Georgaklis, 931 N.E.2d 995, 999 (Mass. 2010); Mislosky v. Wilhelm, 286 A.2d 267, 271 (Vt. 1971). The crucial issue in deciding whether a joint venture existed is whether the parties *intended* to associate as joint venture partners. Georgaklis, 931 N.E.2d at 999; Mislosky, 286 A.2d at 271. Additional factors to consider include whether the parties each (1) shared in the profits and losses; (2) contributed money, assets, or talents, to a common undertaking; (3) had a "joint property interest in the subject matter of the venture"; and (4) had "a right to participate in the control of the venture." Georgaklis, 931 N.E.2d at 999 (citation and quotation marks omitted); accord Winey, 636 A.2d at 751 ("[T]here must be an agreement to share in profits and losses, joint control or right to control, a joint proprietary interest in the subject matter and a community of interest in the performance of the common purpose.").

---

the contract is executed." Berrios v. Orlando Reg'l Healthcare Sys., 100 So. 3d 128, 130 (Fla. 5th DCA 2012); see Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc., 485 F.3d 1233, 1240 (11th Cir. 2007) ("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state." (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941))). Because the joint venture agreement was made, if at all, between Barsky and Kahana before 2015 through informal oral or digital communication while they resided in their respective states—Vermont and Massachusetts—it is clear that Florida law does not apply to the joint venture agreement.
    But whether Vermont or Massachusetts law applies is not so clear. A contract is formed in the state "where the last act necessary to complete the contract [wa]s done." Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc., 363 F.3d 1089, 1092–93 (11th Cir. 2004) (alteration in original) (citation and quotation marks omitted). Here, the "last act" would be either Barsky's or Kahana's oral acceptance of an offer to create a joint venture. See id. Because the record is sparse regarding the creation and development of idCliQ, the Court cannot conclude which party accepted an offer to create a joint venture, and thus it cannot determine whether Massachusetts's or Vermont's law applies. Fortunately, this case presents a "false conflict," as Massachusetts law and Vermont law are substantively similar regarding the formation of joint venture agreements, and the application of either law will result in the same outcome. Tune v. Philip Morris Inc., 766 So. 2d 350, 352 (Fla. 2d DCA 2000) (explaining false conflicts).

OCR's strongest argument in favor of the existence of a joint venture agreement is a February 2, 2015 email from Eyal Barsky, OCR's president, to Paz Kahana, president of both CharacTell entities, in which Barsky states that he "never received the joint venture agreement that you spoke about before my move [to Florida]." (Ex. E to Third Barsky Decl., Doc. 49-1 at 32).[3] In response, Kahana stated, "You are correct, I drafted it while I was in Israel." (Id.). In late February or early March 2015, the agreement drafted by Kahana was sent by Ofer Comay, vice president of CharacTell, Ltd., to Barsky. (Third Barsky Decl., Doc. 49, ¶ 25; Kahana Decl., Doc. 51-1, ¶ 29). The proposed agreement included the following general terms:

1. idCliQ technology is based on technology [CharacTell] has already developed and as such belongs entirely to [CharacTell].
2. [CharacTell] is free to sell any of its technologies or the entire company without hindrance.
3. OCR[] is licensed to sell [CharacTell] products which includes idCliQ from [CharacTell] at most favorable terms.
4. OCR[] may—with prior consultation . . . and approval by [CharacTell—] offer to sell [CharacTell] technology to its clients. In such case, if [CharacTell] accepts this offer . . . OCR will get [a] percentage of the sale.

(Ex. F to Third Barsky Decl., Doc. 49-1 at 33). With regard to CharacTell's "Stand-Alone Products"—which included idCliQ—the proposed agreement specifically stated:

1. OCR[] will have exclusive sales rights during 2015.
2. OCR[] will continue to have exclusive rights in 2016 if net income in 2015 is above 800K . . . .
3. OCR[] will continue to have exclusive rights in 2017 if net income in 2016 is above 1,500K . . . .
. . . .
5. OCR[] will receive 50% of the net income . . . from all customers and resellers, for products and maintenance and support.
. . . .
7. No other exclusive rights are granted.

---

[3] The page numbers for the exhibits refer to the page numbers assigned to the PDF document when it was filed in CM/ECF.

(Id.). The agreement also outlined four possible situations in which OCR would receive a certain percentage from the sale of a CharacTell technology license (idCliQ, for example) or the sale of the CharacTell company in its entirety. (Id. at 34).

It is undisputed that the proposed agreement drafted by Kahana and sent by Comay was not an agreement for a joint venture but was instead a proposal for OCR to become an exclusive reseller of CharacTell's products, including idCliQ. For example, Barsky states in his third declaration:

> I was upset with this offer because it did not properly characterize our agreement as we had discussed numerous times and CharacTell had confirmed. Most importantly, it did not reflect the 50/50 split on which we had agreed. . . .
>
> . . . As our arrangement was never that OCR would be merely a reseller of idCliQ, as opposed to half owner, [the proposed agreement] was not a basis for reaching resolution.

(Third Barsky Decl. ¶¶ 26–27). Despite Barsky's representations in his declaration, however, there is evidence that he was pleased with Kahana's proposal. On March 17, 2015, Barsky responded to Kahana's proposal by stating: "Thank you for putting so much thought to this, sorry it took so long but I wanted to make sure I did the same. In general I believe you are being very fair and appreciate it." (Ex. N. to Kahana Decl., Doc. 51-1 at 110).

Thereafter, Barsky's attorney incorporated the terms from CharacTell's proposal into a formal agreement.[4] On October 29, 2015, Barsky sent that agreement, titled "CharacTell Software Reseller Agreement – rev2.docx," to Kahana. (Ex. J. to Kahana

---

[4] The only substantive changes to Kahana's initial proposal were that Barsky lowered the threshold sales numbers required by OCR to continue being an exclusive reseller. (Ex. J. to Kahana Decl., Doc. 51-1 at 91 (lowering the $800K threshold to $300K and lowering $1,500K to $600K)).

5

Decl., Doc. 51-1 at 75). The draft agreement stated clearly that CharacTell would retain full ownership of idCliQ and that OCR would be an exclusive reseller of idCliQ so long as OCR could maintain a certain volume of sales.[5] (Id. at 76, 85, 91).

The parties' proposal and draft agreements that were exchanged in 2015 suggest that neither Barsky nor Kahana believed that their relationship regarding idCliQ was a joint venture.[6] Indeed, the correspondence that followed Barsky's email in which he referred to a "joint venture agreement" is consistent with Kahana's representation that "I interpreted [Barsky's] words 'joint venture' to mean the reseller relationship." (Kahana Decl. ¶ 29). Moreover, several of the joint venture factors are unmet. There is no evidence that the parties intended to share in any losses, create a joint property interest in idCliQ, or share a right to participate in the control of the venture. Therefore, OCR fails to meet its burden of showing a substantial likelihood of success on the merits as to the existence and enforceability of a joint venture agreement.

---

[5] The draft agreement defines OCR as "Reseller" and CharacTell as "Supplier." (Id. at 76). It further provides in section 14.4: "Reseller hereby confirms that as between Supplier and Reseller, Supplier shall own all right, title, and interest in and to the Software and the Products and all valid and existing intellectual property rights therein." (Id. at 85). The terms "Software" and "Products" are defined in section 1 to mean, respectively, "the executable object code for Supplier's products as defined in Exhibit A" and "the packaged collection of Software, Documentation and EULAs that Reseller is hereby authorized to resell." (Id. at 76). And Exhibit A of the agreement states: "Reseller is authorized to market and sell the Supplier's products and their associated modules and options listed herein: All Supplier's products including idCliQ." (Id. at 91 (emphasis in original)).

[6] OCR's reference to the plural pronouns in Kahana's and Comay's emails as evidence of a joint venture agreement is likewise unconvincing. (Third Barsky Decl. ¶¶ 11–12 (referring to emails written by Comay and Kahana in which they use the pronouns "us," "our," and "we" when describing a long-term strategy for selling idCliQ.)). It is unclear from the record whether plural pronouns refer to "Kahana and Comay" or to "OCR and CharacTell." But even assuming that the plural pronouns referred to OCR and CharacTell, they do not demonstrate intent to create a joint venture. Those emails—sent on January 11 & 12, 2015—were shortly followed by CharacTell's proposal for an exclusive reseller relationship, as opposed to a joint venture. (Ex. F to Third Barsky Decl., Doc. 49-1 at 33).

### 2. *Mutual Confidentiality Agreement*

OCR's second basis for preliminary injunctive relief is a Mutual Confidentiality Agreement (MCA) that was signed by the parties on November 12, 2012.[7] (Ex. A. to Third Barsky Decl., Doc. 49-1 at 1). Generally, the MCA anticipates that CharacTell and OCR would exchange sensitive information during their business relationship that must be protected. Pursuant to that agreement, OCR revealed the identities of several clients to CharacTell. Now, OCR claims that CharacTell has been trying to lure away OCR's clients in violation of the MCA. The MCA specifically provides that a party's "proprietary information"—which is defined to include "customers and product development plans" and "non-public information about customers"—must be held in confidence by the other party and that party must not "make any use whatsoever at any time of such [p]roprietary [i]nformation." (Id.).

Almost one year after signing the MCA, on September 30, 2013, the parties executed a reseller agreement wherein CharacTell granted OCR the rights to resell CharacTell's "Formstorm" software (Formstorm Agreement)—another software product offered by CharacTell. (Ex. F. to Kahana Decl., Doc. 51-1 at 25–39). Section 17.7 of the Formstorm Agreement provides:

> This Agreement constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof, superseding any and all other previous and contemporaneous agreements, understanding, proposals, conditions, warranties, representations or statements, oral or written, with regard to the subject matter hereof. *Any previous agreements between the parties pertaining to the subject matter of this Agreement, unless otherwise specified herein, are hereby expressly canceled and terminated.*

---

[7] Amos Attar, a representative of CharacTell, signed the MCA on November 12, 2012, writing the date in a manner common in Israel: day/month/year or 12/11/2012. OCR's counsel stated during the hearing that Barsky signed the MCA after Attar and copied the date from Attar's signature line. Thus, it is unclear exactly when Barsky signed the MCA.

7

(Id. at 33 (emphasis added)). The question here is whether this section of the Formstorm Agreement had the effect of terminating the MCA.[8]

The Formstorm Agreement contains provisions that that appear duplicative of the subject matter of the MCA. The Formstorm Agreement states in section 14: "The parties agree to treat all information provided by one party to the other marked as confidential (or similar) as 'Confidential Information'"; "Neither party will make use of, disseminate or in any way disclose Confidential Information except to the extent necessary for executing this Agreement"; and "Each party will treat the other's Confidential Information with the same degree of care as it accords to its own confidential information, but in no event less than reasonable care." (Id. at 31).

These provisions may have been fatal to the MCA because they arguably cover the same "subject matter" of the MCA, which discussed the handling of "proprietary information" that one party disclosed to the other. (See Ex. F to Kahana Decl., Doc. 51-1 at 33 ("Any previous agreements between the parties pertaining to *the subject matter of*

---

[8] OCR argues that the MCA survived the Formstorm Agreement, principally relying on a prior order entered in this case by the district judge to whom this case was then assigned. That Order, which was issued on April 19, 2917, states that "no basis exists to find that the [Formstorm] Reseller Agreement governs the idCliQ software." (Order, Doc. 35, at 7 (concluding that the Formstorm Agreement did not apply to Counts I through IV of the Complaint)). Relying on that Order, OCR contends that the MCA survived the Formstorm Agreement with regard to any confidential information shared during the development and reselling of the idCliQ software. But OCR's argument is flawed because the MCA does not apply to any product in particular; rather, it governs confidential information that the parties exchanged throughout the course of their business relationship. Indeed, at the time the parties signed the MCA, idCliQ did not even exist. (See Third Barsky Decl. ¶ 6).
Moreover, the Order upon which OCR relies stated that the Formstorm Agreement did not apply to Counts I–IV of the Complaint, but it did not refer to Count V of the Complaint—which alleges violations of the MCA—because OCR did not assert Count V until it filed the Supplement Complaint a week later, on April 26, 2017.

8

*this Agreement*, unless otherwise specified herein, are hereby expressly canceled and terminated." (emphasis added)). Because it is unclear from the record evidence whether the MCA survived the execution of the Formstorm Agreement, OCR has not carried its burden of showing that it has a substantial likelihood of success on the merits based on the MCA.

### B. Irreparable Harm

As to the second factor—irreparable harm—OCR contends that it cannot provide maintenance and support to its current clients and that "[m]any customers have already been lost and moved to another [software] solution as a result of CharacTell's actions." (Third Barsky Decl. ¶ 81). "Although economic losses alone do not justify a preliminary injunction, 'the loss of customers and goodwill is an irreparable injury.'" BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005) (quoting Ferrero v. Associated Materials Inc., 923 F.2d 1441, 1449 (11th Cir. 1991)). Barsky attests that OCR has already lost customers and will continue to do so. (Third Barsky Decl. ¶¶ 81–89). It is unclear how many customers OCR has lost as a percentage of its overall customer base, but it is not difficult to imagine that having no access to idCliQ and thus being unable to provide continuing maintenance and support will result in frustrated customers who may turn to other suppliers. Such a harm would be not be merely speculative. Siegel, 234 F.3d at 1176 ("[T]he asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990))).

## C. The Third and Fourth Factors

Regarding the third factor, OCR fails to make a sufficient showing that its threatened injury outweighs the harm injunctive relief would inflict on CharacTell. In its motion, OCR requests that CharacTell provide it full access to idCliQ, including the "source code and executable files for clients to download, use in trial and use in production," and that CharacTell be prohibited from contacting OCR's customers without prior written approval. (Mot. Prelim. Inj. at 25). During the hearing, OCR's counsel proposed an alternative to acquiring a copy of the idCliQ source code, which would require the court to specify what CharacTell must do to comply with the parties' prior practices of providing software access and maintenance. He further proposed that the source code could go into a third-party repository where it would be securely held.

The initial relief sought by OCR would be highly burdensome—if not outright devastating—to CharacTell. As CharacTell notes, the source code for idCliQ contains all of CharacTell's work dating back to 1998 and all of the data for CharacTell's products in the "Formstorm family." (Comay Decl., Doc. 51-2, ¶¶ 29–31). Moreover, for the source code to be usable to OCR, OCR would likely need to reveal the code to a third-party programmer, which would subject CharacTell to the risk of unwanted disclosure of its proprietary software code that it has developed for almost twenty years. The alternative method proposed by OCR is marginally less burdensome to CharacTell, given that the software code would be securely held by a third party. However, OCR's counsel provided no good reason that the underlying code for idCliQ must be turned over in any event. The remainder of the relief sought by OCR—including requiring CharacTell to provide written notice when contacting OCR's clients and requiring CharacTell to provide maintenance and access to OCR's idCliQ clients—is less harmful than the injury threatening OCR.

As to the fourth factor, the issuance of an injunction will neither serve the public interest nor harm it.

**D.    Conclusion**

The preliminary injunction factors weigh in favor of denying OCR its requested relief. Most significantly, OCR fails to persuade the Court that it has a substantial likelihood of success on the merits. See Schiavo, 403 F.3d at 1232 ("The first of the four prerequisites to temporary injunctive relief is generally the most important."). Accordingly, it is **ORDERED** that OCR's motion for preliminary injunction (Docs. 45, 48) is **DENIED**.

**DONE** and **ORDERED** in Orlando, Florida, on June 22, 2017.

                                                                                              JOHN ANTOON II
                                                                                              United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties